UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF  NEW YORK

_____

CARL CAPRON,

                                        Plaintiff                    DECISION AND ORDER

-vs-
                                                                     14-CV-6080 CJS

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                                        Defendant.

_____

APPEARANCES

For the Plaintiff:              Mark M. McDonald, Esq.
                                Bond, McDonald and Lehman, P.C.
                                91 Genesee Street
                                Geneva, New York 14456

For the Defendant:              Andreea Laura Lechleitner, Esq.
                                Social Security Administration
                                Office of General Counsel
                                26 Federal Plaza, Room 3904
                                New York, New York 10278

                                Kathryn L. Smith, A.U.S.A.
                                Office of the United States Attorney
                                for the Western District of New York
                                100 State Street, Room 620
                                Rochester, New York 14614

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

which denied the application of Carl Capron ("Plaintiff") for Social Security Disability

Insurance ("SSDI") benefits and Supplemental Security Income ("SSI") disability benefits.

Now before the Court is Plaintiff's motion (Docket No. [#9]) for judgment on the pleadings

and Defendant's cross-motion [#11] for judgment on the pleadings.  Plaintiff's application

is denied and Defendant's application is granted.

VOCATIONAL HISTORY

At the time of the hearing Plaintiff, who was 41 years of age, had graduated from

high school and worked at various jobs, including that of "mixer" at a food processing

plant, "mold operator," "press operator" and machine operator at multiple factories, and

"propane tank reconditioner" at a gas company. (189).  Plaintiff's longest period of

employment at the same job was six years, when he worked at a turkey farm. (287).

PROCEDURAL HISTORY

On December 5, 2011 Plaintiff applied for both SSDI and SSI benefits, claiming to

be disabled due to "bipolar disorder, mania and depression." (34).  Later, Plaintiff

expanded his claim to include problems with his hands and elbows, specifically, "arthritis

in both hands and tendinitis in both elbows." (34-35, 38).  Plaintiff claimed that he

became unable to work on June 20, 2010. (155).[1]

---

[1]Plaintiff also indicated, though, that he subsequently worked between October 2010 and December 2010, and stopped working only because the job "ended due to lack of work." (173, 188). However, the ALJ apparently determined that such work did not qualify as substantial gainful employment. (17).

As part of his application, Plaintiff described his activities of daily living.  For example, on December 22, 2011, Plaintiff, who was living with his parents at the time, due to a court order preventing him from living with his long-time live-in girlfriend, indicated that he had no problem with his own personal care (196), was able to cook his own meals (197-198), and could do laundry, "mowing and some gardening," "some cleaning," "simple household repairs" and shopping. (198-199).  Plaintiff stated that he spent his days visiting with family, watching television, reading, playing video games, gardening and attending medical appointments and meetings of Alcoholics Anonymous and Narcotics Anonymous. (199-200).  Plaintiff indicated, though, that it was difficult to do work requiring steady hands because his hands shake, apparently as a side-effect of his Lithium medication. (198).  Plaintiff also reported that he believes he has a short attention span. (200, 202).  However, Plaintiff indicated that he could follow oral and written instructions, and had no problem getting along with "bosses" or other authority figures. (202).  In February 2012, Plaintiff reported that he was again living with a girlfriend (362).  At that time, Plaintiff also reported that his daily activities included cooking, cleaning, laundry, shopping once per week, and providing childcare for his daughter on weekends. (367-368).

In connection with Plaintiff's application, the Commissioner, through the New York State Division of Disability Determinations ("DDD"), obtained medical records from the treatment providers that Plaintiff identified. *See*, Disability Worksheet (191-193, 390-398) & Exhibits 1F-10F.  For example, the Commissioner obtained records (311-360) from Auburn Memorial Hospital ("Auburn Memorial") in Auburn, New York, where Plaintiff previously resided, records from Plaintiff's primary care physician after Plaintiff moved to

3

Lyons New York, (255-261), treatment records from Plaintiff's mental health therapist (269-299) and records from Plaintiff's arm surgeon (262-268), as well as reports from a consultative psychiatric evaluation by psychologist Rachelle Hansen, Psy.D ("Hansen") (300-304, 362-366) and a consultative orthopedic examination by Harbinder Toor, M.D. ("Toor"). (367-371).

Plaintiff's aforementioned records from Auburn Memorial primarily pertain to three separate medical issues: 1) an in-patient admission in April 2010 after he became intoxicated and suicidal; 2) a complaint of chest and arm pain; and 3) in-patient treatment following a suicidal gesture in July 2010 and the treatment of his underlying depression. (315).  The Court will discuss each of these issues in turn.

On April 13, 2010, Plaintiff was referred to Auburn Memorial's ER by the Auburn Police Department, due to the fact that he was intoxicated, agitated, depressed and suicidal. (344-360).  Plaintiff reportedly indicated that he had "run out" of psychiatric medications two days earlier and had "been drinking in place of meds." (347).  At the time of admission, on April 13th at approximately 10:30 p.m., Plaintiff was intoxicated, depressed, suicidal, angry and hallucinating. (351).  By the following morning, Plaintiff's mental status was much improved.  Specifically, on April 14, 2010 at 10:15 a.m., Plaintiff was fully oriented and cooperative, his memory was intact, his affect and thought process were  within normal limits, he was not hallucinating and he denied feeling suicidal. (347).  However, Plaintiff's insight, judgment and impulse control were poor. (348). Plaintiff also felt "stressed" over his personal relationships (his girlfriend was undergoing "extensive treatment for cocaine") and employment (he was recently laid off from work). (349).

4

In June 2010, Plaintiff returned to Auburn Memorial complaining primarily of pain in his chest, though he also indicated that his left arm sometimes felt numb. (331). Plaintiff's mental state at that time was apparently unremarkable. (334).  Medical staff performed a variety of tests, but it t does not appear that they found a particular reason for Plaintiff's chest pain.

Plaintiff returned to Auburn Memorial's ER in July 2010, following a suicidal gesture in which he consumed alchohol and over-the-counter medications (Excedrin and cold tablets). (286).  Upon admission to the hospital, doctors described Plaintiff as having "a history of depression and possibly cycling mood disorder as well as alcohol dependence." (318).  Plaintiff indicated that prior to his impulsive overdose, "he had actually been doing fairly well in treatment of his depression with Zoloft," that he had stopped taking that medication when he lost medicaid coverage due to the fact that his income had increased. (318).  Similarly, Plaintiff stated that he had been taking Seroquel, which was "quite good for his anxiety and depression," but had stopped taking it due to the cost. (318).  Plaintiff added, though, that even when he was taking Zoloft he still had some "depressive symptoms." (318).  The results of a mental status exam performed at the time of admission to the hospital were essentially unremarkable, although his "mood was dysphoric at times" when talking about his family problems, and his judgment and insight were "partial." (319).  On July 19, 2010, David Strickland, M.D. reported the results of Plaintiff's mental status examination, in pertinent part, as follows:

> He is alert.  He is oriented, pleasant, cooperative, well dressed and well groomed.  Psychomotor activity is unremarkable.  No tardive dyskinesia [involuntary movements].  No tremor.  He is certainly not intoxicated.  His speech is unremarkable.  Thoughts are logical and linear.  Thought content

is reality-based.  His mood is stated as 'much better.'  His affect is euthymic.  He denies adamantly any suicidal ideation or intent.  His judgment and insight appear improved at this time, though I sometimes think he underestimates the power of alcohol in his illness.  He is not psychotic.  His cognitive function, attention span and fund of knowledge are unremarkable.  . . .  I would say if he remains abstinent from alcohol, continues with therapy and responds well to the combined psychiatric medication [Lithium and Celexa] and psychotherapy approach, he should do well.  However, certainly, if he goes back to drinking or abusing substances of any kind, his prognosis will be poor due to his history of impulsive behaviors.

(316).

As mentioned earlier, the Commissioner also obtained records from Plaintiff's primary care physician in Lyons, New York (Exhibit 1F), Effat Jehan, M.D. ("Jehan"), which cover the period of late 2010 to early 2011.  Such records refer cursorily to Plaintiff's history of bipolar disorder and to the purported suicide attempt in July 2010. (255).  The records also indicate that Plaintiff takes psychiatric medications including Lithium and Trazodone. (256).  Otherwise, the records pertain mainly Plaintiff's complaints of pain/numbness in his hands and left elbow.  On September 22, 2010, Plaintiff had his initial visit with Jehan, at which time he was complaining of hand pain. The results of Jehan's examination of Plaintiff were normal, and he ordered routine testing such as a lipid panel. (261).  On October 20, 2010, Plaintiff reportedly told Jehan that "his hand pain is a lot better." (260).  Jehan observed that Plaintiff's lab test results were "ok," except that his Vitamin D level was low. (260).  On January 4, 2011, Jehan reported that Plaintiff was complaining of pain in his left elbow, which he had been experiencing for "the past three months." (259).  Jehan's impression was "lateral

epicondylitis" of the left elbow, for which he prescribed Naproxen (Aleve) as needed. (259).  On March 1, 2011, Jehan reported that Plaintiff was complaining of bilateral heel pain, dry skin and boils on his thigh and back. (258).  Otherwise, Plaintiff's physical examination was normal.

The Commissioner also obtained records from Plaintiff's orthopedic surgeon, Daniel Alexander, M.D. ("Alexander"), who provided a medical source statement dated January 5, 2012. (Exhibit 2F).  Alexander indicated that Plaintiff had left lateral epicondylitis and "bilateral cubital/carpal" tunnel syndrome, about which Plaintiff was complaining of numbness and tingling of the hands. (262). Alexander indicated that Plaintiff was receiving injections and physical therapy, and that "improvement [was] expected." (263).  Alexander stated that despite Plaintiff's complaints, he had "no limitations" on his ability to lift and carry, stand and/or walk, sit, and  push and/or pull. (265-266).  Alexander further stated that Plaintiff had no postural or manipulative restrictions. (266).  Alexander stated, though, that he could not "provide a medical opinion regarding [Plaintiff's] ability to do work-related activities." (266).  Plaintiff contends that such statement is contradictory, but the Court disagrees.  In that regard, viewing Alexander's report as a whole, including his unambiguous statements that Plaintiff had "no limitations" in the foregoing areas, and also due to the fact that Plaintiff was not working at the time, the Court understands Alexander's statement about "work-related activities" to mean only that he was not expressing any opinion about Plaintiff's ability to perform any *particular* work-related tasks that would involve activities other than those about which he had already given an opinion.  In support of that view, the Court notes that Alexander later reiterated that Plaintiff could go "back to work without restrictions."

(495).

The Commissioner also obtained records from Plaintiff's mental health therapy provider, Wayne Behavioral Health Network ("Wayne Behavioral"), which apparently cover the period between August 4, 2010 and November 1, 2011. (Exhibit 3F).  Plaintiff began treating with Wayne Behavioral in August 2010, following the purported suicide attempt in July 2010, after which he had moved from Auburn to Lyons to live with his parents. (286).  Plaintiff reported that the overdose incident arose because he was distraught over the fact that Child Protective Services ("CPS") had determined that he could no longer reside with his girlfriend, their daughter, or the girlfriend's son, because years earlier a court had issued a restraining order against him that was still in effect, preventing him from having contact with his girlfriend, even though he and his girlfriend had been living together despite the order of protection. (286).  Plaintiff indicated that he was attempting to address his substance-abuse problem through treatment, so that he could retain custody of his daughter. (286). Plaintiff further indicated that in 2009, he had attended college full-time, but quit to care for his daughter due to his girlfriend's drug addiction. (294) ("He has been linked to VESID and was going to college full-time last year but he had to quit to care for the kids as GF was using.").  Upon examination, Ronald Biviano, M.D. ("Biviano") reported that Plaintiff was alert and oriented and had logical thoughts, average intelligence, good memory, and fair judgment and insight. (289).  Biviano added, though, that Plaintiff claimed to feel "aggravated," depressed and easily agitated,  and displayed a "reactive" affect. (289).  Biviano made the following observations, in pertinent part:

> The client is referred for treatment after a lethal [sic] suicide attempt taking
> multiple pills.  He feels depressed, poor sleep, decreased appetite with 8
> pound weight loss since July 15, 2010, he reports that he is easily agitated.
> He stated he does not want to be around people at all not even in stores.   .
> . . Currently he is stressed by separation from his ex-girlfriend and her son,
> he is not working and is staying with his parents.  . . .   He seems to be
> overwhelmed by his current life circumstances.  He does report symptoms
> that are in line with Bipolar illness and is being treated with medication
> [Lithium] for [that] illness.  . . .   He was previously prescribed Zoloft  and
> Seroquel but lost ability to pay for them when his income increased too
> much and he lost medicaid.  He will follow up in 4 weeks.

(291).  Biviano further indicated that when Plaintiff was abusing alcohol he had "the

potential to be impulsive." (289).

Between March 4, 2011 and August 31, 2011, Plaintiff did not receive treatment

from Wayne Behavioral, because he was incarcerated in the Cayuga County Jail due to

the fact that he apparently violated the aforementioned order of protection. (272-274,

276).  However, on September 15, 2011, Plaintiff returned to Wayne Behavioral for

treatment.  On October 12, 2011, James Arena LCSW ("Arena") reported that Plaintiff

was seeking treatment for "ongoing depression/bi-polar/anger issues." (276).  Arena

noted that Plaintiff was taking the medications Celexa and Lithium. (277).  Arena further

reported that Plaintiff was unemployed and not seeking work, and listed the following

reasons why Plaintiff had left his last job: "low pay, crisis and drug  addiction by patient

and his female partner." (282).  Arena conducted a mental status exam and reported that

Plaintiff had a flat affect, anxious mood, focused thoughts, intact orientation and memory,

good insight and poor judgment. (284).  Arena gave Plaintiff a GAF score of 61,

observing that Plaintiff had a depressed mood, mild insomnia, some difficulty with social

functioning, some difficulty with school/occupational functioning and some meaningful relationships. (285).  Arena additionally reported that Plaintiff was compliant with his medications and generally had "psychiatric stability," though he occasionally relapsed and used alcohol. (273).

As mentioned earlier, the Commissioner also had Plaintiff examined by consultative psychologist Dr. Hansen, on February 16, 2012. (362-366).   Plaintiff reportedly told Hansen that he stopped working in 2010 "due to a breakdown" (362), though the record contains no record of such a breakdown, or of any particular event that preceded Plaintiff's cessation of work.[2]  Plaintiff reported to Hansen a variety of depression- and anxiety-related symptoms.  Upon examination, Hansen found that Plaintiff's affect was "depressed and anxious" and his mood was "dysthymic," but otherwise his mental state was essentially normal.  More specifically, Hansen reported that Plaintiff's thought processes were coherent and goal-directed,  he was oriented to person, place and time, his attention, concentration and memory were intact, his cognitive functioning was average, and his insight and judgment were fair. (363-364). Hansen's medical source statement was as follows:

> The claimant is capable of following and understanding simple directions and instructions.  The claimant can perform simple tasks independently. The claimant is able to maintain a regular schedule.  The claimant is cognitively able to learn new tasks.  The claimant may have difficulty performing complex tasks independently.  The claimant has some difficulty

---

[2]At the hearing, the ALJ attempted unsuccessfully  to determine exactly why Plaintiff claimed that he became unable to work on June 20, 2010 due to bipolar disorder, when the following exchange took place between the ALJ and Plaintiff's counsel: "ALJ:  All right.  Counsel, why is the onset date June 20th, 2010, do you have any idea?  ATTY:  That's when he stopped working due to his bipolar disorder, Your Honor.  ALJ: It looks like he stopped working then, okay, due to bipolar?  ATTY:  Yeah.  ALJ:  I mean, is there something like – did he – was he hospitalized on that date?  ATTY:  No, Your Honor." (35-36).

making appropriate decisions.  The claimant  has difficulty relating adequately with others.  The claimant does not deal appropriately with stress.  The claimant's difficulties appear to be caused by his psychiatric diagnosis.  The results of the present evaluation appear to be consistent with psychiatric problems, and this may significantly interfere with [his] ability to function on a daily basis.

(365).  Hansen's prognosis was "guarded," "given [Plaintiff's] extensive psychiatric difficulties." (366).

The Commissioner also had Plaintiff examined by consultative orthopedic examiner Dr. Toor, on February 16, 2012. (367-371).  Toor's report is based on a physical examination of Plaintiff and Toor's review of an x-ray of Plaintiff's left arm.  Toor reported that Plaintiff's "chief complaint" was pain in his right arm, resulting from a fracture of his right wrist in 2010.  Plaintiff reported that he had numbness and tingling in his right hand, as well as difficulty "grasping, holding, pushing, pulling, lifting, and reaching with the right arm." (367).  Toor examined Plaintiff's spine and upper and lower extremities, and reported normal findings except with regard to Plaintiff's right arm.  As to that, Toor reported that Plaintiff "has mild to moderate limitations with pushing, pulling, lifting, reaching, grasping, holding, writing, tying shoelaces, zipping a zipper, buttoning a button, manipulating a coin, or holding objects with the right arm/right hand[.]" (369).  Toor observed no such limitations with regard to Plaintiff's left hand/arm, and instead reported full range of motion and strength in the left hand/arm. (369).

The Commissioner also obtained a Psychiatric Review Technique (372-385) and Mental Residual Functional Capacity Assessment (386-389) from non-treating non-

examining state agency psychologist E. Kamin ("Kamin").[3]   On the Mental RFC form,

Kamin indicated that Plaintiff was only "moderately" limited with regard to understanding

and remembering detailed instructions, carrying out detailed instructions, working in

close proximity with others without being distracted by them, completing a normal

workday and workweek without interruptions from his symptoms, interacting appropriately

with the general public, getting along with co-workers and traveling in unfamiliar places or

using public transportation. (386-387).   Overall, Kamin concluded that Plaintiff "retains

the ability to perform entry level work with limited contact with people." (388).[4]

Based upon the foregoing evidence, on March 14, 2012, the Commissioner

denied Plaintiff's application for SSDI and SSI benefits. (73-86). The Commissioner

determined that despite Plaintiff's physical and mental problems he was still capable of

performing less than a full range of light work, with "limitations in pushing/pulling,

reaching and handling & fingering with [his right] arm/hand, and [having] limited contact

with people."(75).

On or about May 16, 2012, Plaintiff appealed, and the Commissioner scheduled a

hearing before an ALJ for October 16, 2012.  Meanwhile, on July 25, 2012, Plaintiff

notified the Commissioner that he had retained an attorney. (112) ("Appointment of

Representative").  Approximately two months later, on September 21, 2012, Plaintiff's

---

[3]The Court observes that the markings on theses two forms are so faint as to be almost illegible. In fact the first time the Court reviewed these forms it appeared that they were left blank.  However, upon careful study, the Court perceives that there are faint "checks" in many of the boxes on these forms.

[4]On the Psychiatric Review Technique form, Kamin indicated that there was insufficient evidence concerning Plaintiff's claimed bipolar disorder and polysubstance abuse disorder. (375, 380, 384). Consequently, in his decision the ALJ essentially rejected Kamin's Psychiatric Review Technique Form, noting that it was inconsistent with her opinions in her Mental RFC Assessment. (18, n. 1).

attorney wrote to the Commissioner and requested an adjournment of the hearing.  In

that regard, Plaintiff's attorney maintained that Plaintiff's "SSA form-1696 and fee

agreement [which Plaintiff and his attorney had signed on July 25, 2012,] were not

processed until 9/20/12," which had prevented him from "fully review[ing] and

develop[ing] [Plaintiff's] file." (117).  As to that point, it is the Court's understanding that

the attorney did not have the ability view Plaintiff's electronic claim folder prior to the

processing of Plaintiff's SSA form-1696 by the Commissioner, and that without such

access he would not have known which additional records, if any, he needed to obtain

and provide to the Commissioner.  In any event, the ALJ did not respond to Plaintiff's

attorney's letter.

On October 16, 2012, Plaintiff attended the hearing before the ALJ,

accompanied by his attorney. (32-72).  At such time, Plaintiff's attorney did not renew his

request for an adjournment, or even mention his earlier request for an adjournment to

which he had not received a response.  However, counsel told the ALJ that he had been

unable to obtain some of Plaintiff's treatment records, despite having already given the

treatment providers releases signed by Plaintiff.  Plaintiff's counsel did, though, provide

some additional records at the hearing.  Consequently, at the hearing the ALJ had before

him the aforementioned records which the Commissioner had obtained,[5] as well as

exhibits 12F and 13F, all of which, combined, consisted of 147 pages of medical records

covering the period 2010 to 2012. (30-31, 52).  Exhibit 12F consists of a one-page form

report from Arena, Plaintiff's therapist, indicating that Plaintiff is "not capable or working

_____

[5] *See*, HALLEX I-2-1-15.

in any capacity" due to "mental illness," specifically, "bi-polar [disorder]." (400).  The Court observes that in rendering such opinion, Arena merely drew a single line/arrow across the entire list of potential, specific work activities, thereby indicating that they were "not recommended." (400).  Such a broad statement seems curious, since some of the activities appear to be ones that Plaintiff is capable of doing, such as working for either a male or female supervisor,[6] "working alone," "part-time work" and "other." (400).   On the other hand, Arena indicated that Plaintiff was "capable of participating in classroom training." (400).

The second exhibit that Plaintiff's attorney provided at the hearing, Exhibit 13F, was merely a notice by the Wayne County Department of Social Services indicating that Plaintiff was temporarily exempted from "work requirements" because he was "currently unable to work due to a medical issue." (401).  Such determination was apparently made by "Mrs. Collins," though neither her job title nor the basis for her determination is explained on the form. (401).

During the hearing, Plaintiff and/or his attorney also mentioned the following additional records, which they hoped to obtain: 1) medication records from Cayuga Correctional Facility (36);  2) additional "medical source statements"[7] concerning Plaintiff's ability to work despite his "mental and physical" problems (39); 3) "most-recent" treatment records from Wayne Behavioral Health (39-40, 42, 51); and 4) additional

---

[6]As noted earlier, Plaintiff indicated that he had no problem working with "bosses" or other persons in positions of authority. (202).

[7] "Medical source statements are medical opinions submitted by acceptable medical sources, including treating sources and consultative examiners, about what an individual can still do despite a severe impairment(s), in particular about an individual's physical or mental abilities to perform work-related activities on a sustained basis." SSR 96-5p (footnote omitted).

records regarding the fracture of Plaintiff's right hand which was already referenced in

other exhibits. (49).  Plaintiff's counsel told the ALJ that he would obtain these records,

and he asked the ALJ to leave the record open for two weeks to allow him to do so. (39,

51, 71).  The ALJ agreed to leave the record open for two weeks. (71).

During the hearing, Plaintiff testified that he could only concentrate for "maybe 15

minutes" before needing to take a break. (43).  Plaintiff further indicated that he doesn't

like working or being around other people, because it makes him "paranoid, confused."

(43).  On this point, Plaintiff flatly indicated that he does not "go grocery shopping"

because he dislikes being around people (44), even though he previously indicated, both

in his written statement to the Commissioner and during his examination by Dr. Toor, that

he went shopping once per week. (199, 367).  Plaintiff also testified at the hearing that he

"never" leaves home alone, which again seems inconsistent with other statements he

has made concerning his daily activities.[8] (45).  When Plaintiff was asked to explain how

the alleged arthritis in his hands affected his ability to work, he stated: "I have trouble

sometimes with my hands that they freeze up, and when it's cold, they just don't really – I

can't really bend my fingers." (39).  Plaintiff stated that for pain, he takes "naproxen," "as

needed." (50).

After Plaintiff's testimony, the ALJ posed a hypothetical question to the Vocational

Expert ("VE"), asking him to assume

> a hypothetical claimant that's a younger person who's a high school
> graduate.  Assume this person retains the physical RFC to perform light
> work but may only frequently handle, finger or feel.  This person retains the

---

[8]Plaintiff has stated, for example, that he routinely attends Alcoholics Anonymous and Narcotics
Anonymous meetings on an almost daily basis, without indicating that anyone else goes with him.

mental RFC to perform unskilled work where interactions with others are routine, superficial and incidental to the work performed. . . . [T]his person should not do fast paced production work and needs a regular work break approximately every two hours.

(52-53, 55). The VE opined that such a claimant could not perform any of Plaintiff's past relevant work. (57). However, the VE stated that such a claimant could perform other work in the national economy, including "parking lot attendant," DOT 915.473-010, and "sales attendant," DOT 299.677-010. (57). The ALJ then modified his hypothetical to indicate that the claimant could only "finger" occasionally, and the VE stated that such a claimant could not perform the previously-identified job of parking lot attendant, but could still perform the "sales attendant" job. (62). The ALJ then again modified his initial hypothetical to indicate that the claimant could only occasionally handle, finger and feel. (62). The VE responded that such a claimant could still perform other jobs, including "sandwich board carrier," DOT 299.687-014, and "outside deliverer," DOT 230.663-010. (65-66). Lastly, the ALJ modified the hypothetical to involve "[a] high school graduate, younger person, [who] retains the physical RFC to perform light work but may only frequently handle and occasionally finger or feel. The claimant retains [the] mental RFC to perform unskilled work where interaction for those are routine, superficial and incidental; where work performed should not be fast paced production work; [and] who needs a regular work break approximately every two hours." (71). The VE responded that such a claimant could still perform the previously-identified jobs of "sales attendant" and "sandwich board carrier." (71).

On October 24, 2012 and October 29, 2012, following the hearing, and during the period in which the ALJ left the record open, Plaintiff's attorney submitted four additional

packets of medical reports, which the ALJ added to the record as Exhibits 14F-17F.

(402-442).[9]  Exhibit 14F consists of a one-page "Drug/Alcohol Evaluation" form,

completed by Susan Townsend, LMSW ("Townsend"), from Wayne Behavioral. (403).

On the form, Townsend offered only a single opinion, which is that if Plaintiff "were to

completely abstain from the use of any alcohol and drugs, [his] limitations and

impairments [would] continue unabated." (403).  However, Townsend did not indicate the

basis for such opinion.

Exhibit 15F consists of 28 pages of notes from Plaintiff's counseling sessions at

Wayne Behavioral. (405-432).  Such records contain much of the same information that

was already referenced in Exhibit 3F.  However, on April 2, 2012, Plaintiff reported that

he "had longstanding problems with anxiety, particularly in social situations," and that his

depression was triggered by the death of one of his friends when they were teenagers.

(416).  The therapist, though, reported that Plaintiff "*denies* symptoms from the past that

would indicate a bipolar affective disorder or a psychotic disorder.  He reports a

significant history of alcohol dependence, marijuana abuse, hallucinogen abuse and

caffeine abuse." (416) (emphasis added).

Exhibit 16F consists of a printout of Plaintiff's pharmacy records, including

prescriptions for Lithium and Trazodone. (434-438).

Exhibit 17F is an affidavit from Plaintiff's mother, Carole Capron. (440-442).  Mrs.

Capron essentially reiterated that Plaintiff has a short attention span, as evidenced by

---

[9]The following statement in Plaintiff's memo of law is therefore incorrect: "It is true that the ALJ discussed the need for additional records and counsel agreed to provide them, however, the ALJ did not take any steps to ensure that those records were received, *nor did he allow for additional time for their acceptance into the record.*" Pl. Memo of Law at p. 8 (emphasis added).

the fact that he starts new tasks before finishing other tasks. (440-441).  Mrs. Capron

further indicated that Plaintiff can be short-tempered with people if their communications

with him are not "short and right to the point." (440).  Notably, however, Mrs. Capron also

opined that her son is capable of working, "[i]f the job is suitable with [sic] his

medications," and that "as long as he is on his medications he can be productive again."

(442).

On October 31, 2012, after submitting the foregoing additional exhibits, Plaintiff's

counsel wrote to the ALJ and stated that he was "still waiting for a response from several

[of Plaintiff's treating] sources," and asked if the record could be kept open for two

additional weeks, "until 11/14/12." (235).  The ALJ did not respond to the letter, but

neither did he issue a decision at that time or otherwise indicate that he was closing the

record.  As of November 14, 2012, Plaintiff's counsel had not submitted any additional

records, nor did he request a further extension of time to keep the record open.

Consequently, one week later, on November 20, 2012, the ALJ issued his Decision (15-

31), denying Plaintiff's applications for SSDI and SSI benefits.

The ALJ's decision, which found that Plaintiff was not disabled at any time

between the alleged onset date and the date of the decision, follows the familiar five-step

sequential analysis for evaluating disability claims, discussed further below.  At step one,

the ALJ found that Plaintiff had not engaged in substantial gainful employment since the

alleged onset date, June 20, 2010.  At step two, the ALJ found that Plaintiff has the

following severe impairments: "Affective disorder, anxiety-related disorder, substance

addiction disorder, status post right hand injury, and history of left lateral epicondylitis."

(17).  At step three, the ALJ found that none of Plaintiff's impairments meet or medical

equal a listed impairment. (18).  Before reaching step four, the ALJ found that Plaintiff

has the following RFC:

> [T]he claimant retains the physical [RFC] to perform light work but may only
> frequently handle, and occasionally finger, or feel.  Claimant retains the
> mental [RFC] to perform unskilled work, where interactions with others are
> routine, superficial, and incidental to the work performed.  Should not do
> fast paced production work.  Needs a regular work break approximately
> every 2 hours.

(20). In making this RFC determination, it is notable that the ALJ rejected Arena's one-

page  medical source statement not because Arena was a licensed clinical social worker,

but because the report was inconsistent with the reports of Hansen and Kamin, which the

ALJ gave "significant weight," and with Plaintiff's own description of his activities of daily

living. (24).  At step four of the analysis the ALJ found that Plaintiff cannot perform his

past relevant work.  However, at step five of the analysis the ALJ found that Plaintiff can

perform other work, including "sales attendant" and "sandwich board carrier." (26).

Consequently, the ALJ determined that Plaintiff is not disabled. (26-27).

On January 11, 2013, Plaintiff appealed the ALJ's determination to the Appeals

Council. (10-11).  In support of the appeal, Plaintiff submitted five new sets of treatment

records, consisting of 53 pages, which are now set forth in the record as Exhibits 18F-

22F. (6-7).  Presumably these are the records that Plaintiff was attempting to obtain

before the ALJ issued his decision.  The Court observes, though, that Exhibit 18F, a

medical source statement from Plaintiff's primary care physician's PA, Susan Jackson,

RPAC ("Jackson"), concerning Plaintiff's abilitiy to "reach, handle and finger," was

executed on October 12, 2012, and it is therefore unclear why Plaintiff could not have

submitted it to the ALJ before the ALJ issued his Decision.  In any event, in Exhibit 18F

Jackson opines that Plaintiff may only occasionally "reach at or below shoulder level,"

rarely reach above shoulder level with his right arm and occasionally with his left arm,

and rarely handle or finger with either hand. (444).  Jackson further indicates that Plaintiff

should never lift 20 or 50 pounds. (444).  Further, Jackson indicates that Plaintiff has

postural restrictions limiting him to occasionally twisting, stooping, crouching, squatting,

climbing stairs and climbing ladders. (444).  Such opinion is particularly curious to the

Court, since neither Toor, nor Alexander nor any other doctor  indicated that Plaintiff has

any such limitations, or, indeed, any physical restrictions apart from those involving his

hands and arms.  In any event, Jackson further indicates that Plaintiff would likely have

"good days and bad days," and would miss "more than four days per month" from work

due to his impairments. (445).  Significantly, Jackson's report does not reference any

examination notes or other supporting evidence.  The reason for that, presumably, is that

there is no such supporting evidence.  In that regard, while Jackson is a Nurse

Practitioner in the office of Plaintiff's primary care physician, Dr. Hong, the only

references to hand or arm impairments in the records obtained from Hong's practice are

notations of Plaintiff's subjective complaints of hand pain and numbness.[10]  Meanwhile,

---

[10]Of course, a treating source's opinion may take into account the claimants's own subjective complaints or report: "Medically acceptable clinical and laboratory diagnostic techniques include consideration of a patient's report of complaints, or history, as an essential diagnostic tool." *Burgess v. Astrue*, 537 F.3d 117, 128  (2d Cir. 2008) (*quoting Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003), internal quotation marks omitted).  However, a treating source's opinion is not considered well-supported if it is based entirely on the claimants's own subjective reports. *See, Baladi v. Barnhart*, 33 Fed.Appx. 562, 564, 2002 WL 507139 at *2 (2d Cir. Apr. 4, 2002) (A medical opinion based on "plaintiff's subjective complaints of pain and unremarkable objective tests" is not considered to be well supported by medically acceptable clinical and laboratory diagnostic techniques); *see also, Polynice v. Colvin*, 576 Fed.Appx. 28, 31 (2d Cir. Aug. 20, 2014) ("Much of what Polynice labels 'medical opinion' was no more than a doctor's recording of Polynice's own reports of pain.").

all of the physical examinations were normal except for one reference to "arthralgias" in Plaintiff's left elbow and hands (479), and Jackson noted that Plaintiff was being treated for any hand or arm problems by specialists, not Hong.[11] (*See*, Exhibits 1F (255-261), 18F (443-463) and 20F (476-482)).

Exhibit 19F consists of a series of chart notes from Newark Wayne Hospital, dating from October 2010, as well as notes from a "cubital tunnel" surgery in August 2012 on Plaintiff's left elbow.  The Newark Wayne notes indicate that Plaintiff was admitted to the hospital on October 23, 2010, "highly intoxicated," following a purported intentional drug overdose (448), though later notes state that "there is no evidence he OD'd + he denies that he did." (449).  Plaintiff was transported to the hospital by police, who first tasered him (five times), after he became aggressive when they found a crack pipe in his pocket. (458, 459).  The notes report that Plaintiff became intoxicated using alcohol because he was distraught over the ending of a recent "short romance" and had also been inconsistent in taking his medications. (449-450).  On the evening he was admitted, a chart note indicates that he "cont[inues] to have disjointed thoughts – nice and suddenly gets quickly agitated." (459).  Upon being discharged from the hospital two days later, Plaintiff's mood was "good" and his affect was "full and appropriate." (454). Surprisingly, in light of Plaintiff's claim of social anxiety, the notes indicate that while he was in the hospital he was social, "attending groups, recreational activities and social[izing] with select peers." (455).

The remaining portion of Exhibit 19F pertains to cubital tunnel syndrome surgery

---

[11] *See*, (479) ("He is being treated by neurology and orthopedics for those conditions.").

on Plaintiff's left arm on August 1, 2012, by Dr. Alexander. (464-475).  The reader will

recall that Alexander had previously provided a medical source statement about this

same condition. (See, Exhibit 2F (262-268)).  Alexander's surgical notes indicate that the

surgery went well. (474-475).[12]

Exhibit 20F consists of office notes from Dr. Hong, Plaintiff's primary care

physician in 2012, for complaints involving mundane matters such as rashes and the flu.

However, the notes include references to Plaintiff's mental state.  For example, on

October 12, 2012, PA Jackson wrote:

> Psychiatric/Behavioral:  Positive for sleep disturbance and dysphoric mood
> (improving, some days are more difficult.).  Negative for suicidal ideas and
> self-injury.  The patient is nervous/anxious (always).
>
> ***
>
> Psychiatric:  His speech is normal and behavior is normal.  Judgment and
> thought content normal.  His mood appears anxious.  His affect is not
> angry, not blunt, not labile and not inappropriate.  Cognition and memory
> are normal.  He exhibits a depressed mood.

(477-478).  On November 12, 2012, Jackson reported that Plaintiff's "dysphoric mood"

was "well controlled on current medications/followed by [therapy at Wayne Behavioral]

twice a month.  Negative for suicidal ideas and self injury.  The patient is

nervous/anxious (well controlled)." (481).

---

[12]At the hearing, Plaintiff indicated that he was still having some post-surgery pain in his left arm,
but that was apparently normal since Alexander had told him that the arm would probably be sore for
about a year. (46-47) ("I mean, he said it'd be sore for like a year.").

Exhibit 21F is a collection of notes from neurologist Eugene Tolomeo, M.D. ("Tolomeo"), dating from 2011 and concerning Plaintiff's complaints of hand and arm pain prior to his surgery by Dr. Alexander. (483-488).  The notes indicate that Alexander referred Plaintiff to Tolomeo for nerve conduction studies.  Tolomeo reported that Plaintiff was complaining of paresthesias (tingling/pins and needles) in both hands. (484).  Tolomeo indicated that the nerve conduction testing indicated an abnormality with Plaintiff's left elbow (484), which he attributed to left cubital tunnel syndrome (485), for which Alexander later performed surgery.

Lastly, Exhibit 22F consists of notes from Alexander.  Most of the notes are dated prior to Plaintiff's surgery, and report Alexander's impression that Plaintiff had left lateral epidondylitis and bilateral cubital/carpal tunnel syndrome that required surgery. (489-495).  The last two notes, dated August 14, 2012 and September 25, 2012, respectively, are post-surgery, and indicate that Plaintiff was doing well. (494) ("He is doing very well and is happy so far with his outcome.  He is not taking anything for pain."); (495) ("He has been doing well and happy that he had the surgery performed.").  Quite significantly, Alexander stated that Plaintiff could go "back to work without restrictions." (495).

On January 7, 2014, the Appeals Council denied Plaintiff's appeal, finding no basis to review the ALJ's determination. (3-8).  Consequently, the ALJ's determination is the Commissioner's final decision regarding Plaintiff's claim.

On February 20, 2014, Plaintiff commenced this action. Plaintiff contends that the Commissioner's decision must be reversed for four reasons: 1) the  ALJ failed to develop the record; 2) the ALJ and Appeals Council "improperly rejected" the opinions of Plaintiff's treating sources; 3) the ALJ's RFC determination was incorrect; and 4) the

23

ALJ's credibility determination was incorrect.  In connection with Plaintiff's motion for judgment on the pleadings [#9], his attorney has submitted an affidavit [#9-2] along with three additional sets of medical records that were not previously submitted to the Commissioner. *See*, Docket No. [#9-2] at p. 2.[13]

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."  The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard."  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

The SSA has promulgated administrative regulations for determining when a claimant meets this definition.  First, the SSA considers whether the claimant is

---

[13]The first group of records is from Auburn Memorial and pertains to, *inter alia*,  a fracture of Plaintiff's right hand in 2008 during a fight, which is mentioned in records that were already submitted to the Commissioner, and Plaintiff's subsequent request for medications to help him control his anger and irritability.  Such records include a reference to the fact that Plaintiff was using amphetamines and alcohol. (Docket No. [#9-2] at p. 31).  The second group of records are notes made in 2008 by Thomas Sullivan, M.D. ("Sullivan"), and also pertain to the fracture of Plaintiff's right hand, though Plaintiff told Sullivan that he injured his hand in a fall while walking his dog. *Id*. at p. 36.  The third group of records are counseling "progress notes" from Wayne Behavioral, mostly written by Arena, and mostly dealing with anger-management counseling.  These records are largely cumulative of the records already before the Commissioner.

currently engaged in substantial gainful employment.  If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities.  If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations.  If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled.  If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work.  Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted).

Under the regulations, a treating physician's opinion is entitled to controlling

weight, provided that it is well-supported in the record:

If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(c)(2); 20 C.F.R. § 404.1527(c)(2).  However, "[w]hen other

substantial evidence in the record conflicts with the treating physician's opinion . . .  that

opinion will not be deemed controlling.  And the less consistent that opinion is with the

record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d

Cir. 1999)(*citing* 20 C.F.R. § 404.1527(c)(4), formerly designated as 20 C.F.R. §

404.1527(d)(4)).  Nevertheless,

[a]n ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion. 20 C.F.R. § 404.1527[(c)](2). Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. *Id*. The regulations also specify

25

> that the Commissioner 'will always give good reasons in [her] notice of
> determination or decision for the weight [she] give[s] [claimant's] treating
> source's opinion.' *Id*.; *accord* 20 C.F.R. § 416.927[(c)](2); *see also Schaal*,
> 134 F.3d at 503-504 (stating that the Commissioner must provide a
> claimant with "good reasons" for the lack of weight attributed to a treating
> physician's opinion).

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  An ALJ, though,  is not required to

explicitly discuss each factor, as long as his "reasoning and adherence to the regulation

are clear." *Atwater v. Astrue*, 512 Fed. Appx. 67, 70, 2013 WL 628072 at *2 (2d Cir. Feb.

21, 2013) ("Atwater challenges the ALJ's failure to review explicitly each factor provided

in 20 C.F.R. § 404.1527(c). We require no such slavish recitation of each and every

factor where the ALJ's reasoning and adherence to the regulation are clear.") (citation

omitted).

Administrative Law Judges are required to evaluate a claimant's credibility

concerning pain according to the factors set forth in the Commissioner's regulations,

which state, in relevant part:

> In determining whether you are disabled, we consider all your symptoms,
> including pain, and the extent to which your symptoms can reasonably be
> accepted as consistent with the objective medical evidence and other
> evidence. By objective medical evidence, we mean medical signs and
> laboratory findings as defined in § 404.1528 (b) and (c). By other evidence,
> we mean the kinds of evidence described in §§ 404.1512(b)(2) through (8)
> and 404.1513(b)(1), (4), and (5), and (d). These include statements or
> reports from you, your treating or nontreating source, and others about your
> medical history, diagnosis, prescribed treatment, daily activities, efforts to
> work, and any other evidence showing how your impairment(s) and any
> related symptoms affect your ability to work. We will consider all of your
> statements about your symptoms, such as pain, and any description you,
> your treating source or nontreating source, or other persons may provide
> about how the symptoms affect your activities of daily living and your ability
> to work.

\*\*\*

> In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you. (Section 404.1527 explains how we consider opinions of your treating source and other medical opinions on the existence and severity of your symptoms, such as pain.) We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. § 404.1529(a); 20 C.F.R. § 416.929(a).  The regulation further states, in relevant part:

> Factors relevant to your symptoms, such as pain, which we will consider include:
> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3).  However, while an ALJ is required to consider these factors, he is not required to explicitly discuss each one. *See, Pellam v. Astrue*, 508 Fed.Appx. 87, 91, 2013 WL 309998 at \*3 (2d Cir. Jan. 28, 2013) ("The ALJ did not apply an incorrect legal standard when judging the credibility of Pellam's testimony. Although the ALJ did not explicitly discuss all of the relevant factors,

27

Pellam has failed to point to any authority requiring him to do so. In any event, the ALJ

cited the applicable regulation, 20 C.F.R. § 404.1529, explicitly mentioned some of the

regulatory factors (such as Pellam's limited use of pain medication), and stated that he

considered all of the evidence required by § 404.1529.").  If it appears that the ALJ

considered the proper factors, his credibility determination will be upheld if it is supported

by substantial evidence in the record. *Id.*

DISCUSSION

As mentioned earlier, Plaintiff maintains that the Commissioner's ruling must be

reversed for the following reasons: 1) the  ALJ failed to develop the record; 2) the ALJ

and Appeals Council "improperly rejected" the opinions of Plaintiff's treating sources; 3)

the ALJ's RFC determination was incorrect; and 4) the ALJ's credibility determination

was incorrect.

### *Development of the record*

Plaintiff maintains that the ALJ failed to develop the record in various ways.  First,

Plaintiff contends that the ALJ erred by failing to grant his request to adjourn the hearing.

According to Plaintiff, "[n]o reason was provided by the ALJ or his staff as to why an

adjournment was not granted."  Apparently, Plaintiff maintains that the ALJ's failure to

grant such request resulted in the record being incomplete.  However, the Court finds

that Plaintiff waived any argument concerning the requested adjournment by attending

the hearing and saying nothing about the adjournment request.  Instead, Plaintiff

participated fully in the hearing and then asked the ALJ to leave the record open in order

to allow him to submit additional documentation, which the ALJ did.  Moreover, Plaintiff

submitted several additional exhibits to the ALJ after the hearing, which were added to

the record.  Consequently, Plaintiff's argument on this point lacks merit. *See, Brutsche v. Barnhart*, No. 02 Civ. 7304(MBM), 2004 WL 307280 at *2, n. 1 (S.D.N.Y. Feb. 18, 2004) ("I find no error in the ALJ's decision not to grant an adjournment, particularly because Brutsche's legal representatives did not raise this objection at the hearing and because ALJ allowed them to supplement the record after the hearing.").

Plaintiff nevertheless maintains that the ALJ erred because he failed to follow the procedures set forth in 20 CFR § 404.1512(d) which, he argues, required the ALJ to personally contact Plaintiff's treatment providers, even though Plaintiff's attorney indicated that he would obtain the records and even though the ALJ left the record open in order to allow the attorney to do so.  The Court does not agree.  As discussed above, prior to the hearing the Commissioner contacted all of the treatment providers that Plaintiff identified (390-398), and also arranged for consultative examinations by Hansen and Toor.  After the hearing, at Plaintiff's request, the ALJ left the record open for more than a month before issuing his decision, during which time Plaintiff submitted several additional exhibits.  Notably, in that regard, although Plaintiff now complains that the ALJ should have kept the record open longer, it is clear that the ALJ did not issue his decision until after the date which Plaintiff's counsel had requested to submit additional records.  If Plaintiff needed additional time to submit records, beyond the date which he had requested, it was incumbent upon him to notify the ALJ of that fact.[14]  In the absence of

---

[14]Plaintiff suggests that it would have been futile to make another request, since the ALJ did not directly respond to the first request.  The Court disagrees.  In that regard, while Plaintiff suggests that the ALJ ignored his first post-hearing request for additional time, it appears to the Court that the ALJ tacitly granted the request, since he waited until after the date that Plaintiff had requested before issuing his decision.  The Court reiterates that this was not a situation where the attorney needed the ALJ's assistance in obtaining the records, because the attorney eventually obtained the records on his own.  Rather, the issue here is really the attorney's failure to inform the ALJ that he needed a further extension

such a notification, the Court finds that it was reasonable for the ALJ to conclude that

Plaintiff had "nothing further to add" to the record. *See, Jordan v. Commissioner of Social*

*Security*, 142 Fed.Appx. 542, 543, 2005 WL 2176008 at * (2d Cir. Sep. 8, 2005) (ALJ left

the record open to allow claimant's attorney to obtain additional specific records, and

then issued decision after attorney subsequently indicated that he had nothing further to

add to the record);[15]  *see also, Farrell v. Commissioner of Social Security*, No. 7:12-cv-

418 (GLS), 2013 WL 4455697 at *7-8 (N.D.N.Y.  Aug. 16, 2013) (Holding that ALJ

satisfied his duty to develop the record where, prior to the hearing, he obtained certain

records and had the plaintiff examined by consulting doctor, and then, after the hearing,

left the record open initially for two weeks, and then for an additional ten days, in order to

allow the plaintiff's attorney to submit any additional records before issuing his decision,

even though the attorney did not submit any additional records).  Accordingly, the Court

finds that the ALJ complied with § 404.1512(d).

For all of the foregoing reasons the Court finds that Plaintiff's contentions

regarding alleged failures to develop the record lack merit.

<u>*The Commissioner Properly Applied the Treating Physician Rule*</u>

Plaintiff next maintains that the Commissioner "improperly rejected" the opinions

of his treating sources.  In particular, Plaintiff contends that the ALJ improperly rejected

Arena's report, Exhibit 12F, and that the Appeals Council improperly rejected Jackson's

---

of time in which to do so.  Such error was not the fault of the ALJ, who waited until after the date which
counsel had requested before issuing his decision.

[15]The Court observes that the Circuit Court did not require the ALJ to make a further effort to
obtain the records which Plaintiff's counsel had either been unable to obtain, or which he had decided not
to submit.

report, Exhibit 18F.  As mentioned above, Arena's statement  was a one-page form report on which he merely drew a line through all of the possible work activities, indicating, implausibly in light of the entire record, that Plaintiff could not perform any of them, while Jackson's report indicated, *inter alia*, that Plaintiff could not work because he could only occasionally reach and could only rarely handle or finger.

With regard to Arena's statement, at the outset Plaintiff's contention that the ALJ rejected his opinion because Arena, a licensed clinical social worker, "was not an acceptable medical source" is simply incorrect.  Rather, the ALJ correctly indicated that he could consider Arena's statement insofar as it pertained to the "severity of a claimant's impairment and how it affects a claimant's ability to work." (24).

Plaintiff is correct, though, that the ALJ gave "little weight" to Arena's statement because it was inconsistent  with the findings of Hansen and Kamin. (24).  Plaintiff contends that the ALJ "failed to apply the various factors in weighing the opinions from [Arena]," and that the ALJ's reasons "are not supported by the evidence of record."[16] Plaintiff further suggests that Hansen's opinion might have changed if she had access to the fully-developed record.  However, the Court disagrees and finds that the ALJ's determination in this regard complies with the applicable law and is supported by substantial evidence.  To begin with, the ALJ specifically indicated that he "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." (20).  Moreover, the ALJ carefully discussed the medical evidence, including the reports of Hansen, Kamin and Arena, and gave good

---

[16]Plaintiff's memo of law at p. 21.

reasons for why he gave more weight to the opinions of Hansen and Kamin than he did to that of Arena. (20-25).  Although the ALJ may not have discussed every factor under §§ 404.1527 & 416.927, he was not required to do so.  Moreover, the record was sufficiently developed to allow the ALJ to accurately weigh the opinions.

Alternatively, Plaintiff maintains that the Appeals Council should have reviewed the ALJ's determination, based upon the additional exhibits that he submitted with his appeal, and in particular, the medical source statement (Exhibit 18F) (444) from Jackson, because it was "new and material."  Further, Plaintiff contends that the reason offered by the Appeals Council for denying review was insufficient.  In that regard, when Plaintiff appealed to the Appeals Council, the reason he gave is as follows: "The decision is not supported by substantial evidence and the ALJ failed to apply the proper legal standards in weighing the evidence." (10).  In denying review, the Appeals Council indicated that it had considered Plaintiff's appeal statement, as well as the additional evidence that he submitted, and determined that "this information does not provide a basis for changing the [ALJ's] decision." (4).  Plaintiff contends that this was error, and that the Appeals Council was required, pursuant to *Snell v. Apfel* , 177 F.3d 128 (2d Cir. 1999) ("*Snell*"), also cited earlier, to explain the weight that it gave to Jackson's medical source statement.

The Court again disagrees.  In that regard, the Court observes that another claimant unsuccessfully raised this identical argument in *Bushey v. Colvin*, 8:11-CV-00031-RFT, in the Northern District of New York.  In that case, in which the plaintiff had submitted additional medical evidence from her treating neurosurgeon to the Appeals Council, the Appeals Council similarly declined to review the ALJ's determination, stating

only that, "this information does not provide a basing for changing the [ALJ's] decision."[17] In the district-court action, the claimant argued that the Appeals Council was required to "consider" the additional evidence.  The District Court disagreed, finding that the records were not relevant to the period of disability at issue in the case, even though such reason had not been offered by the Appeals Council.[18]  On appeal, the claimant-appellant argued that "[t]he Appeals Council's terse denial of plaintiff's request for review [erroneously] omitted any explanation for its finding that plaintiff's additional evidence did not provide a basis for changing the ALJ's decision."[19]  Nevertheless, the Second Circuit affirmed, after conducting its own plenary review of the record, stating:

> We do not believe that the Appeals Council erred by refusing to review the ALJ's decision in light of the new evidence that Bushey submitted to that body. The Appeals Council had substantial evidence supporting its decision to decline review, as the new evidence that Bushey presented did not alter the weight of the evidence so dramatically as to require the Appeals Council to take the case.

*Bushey v. Colvin*, 552 Fed.Appx. at 98.  From this, it appears that Plaintiff's reliance on *Snell*  is misplaced, insofar as he contends that *Snell* requires the Commissioner to weigh and discuss the newly-submitted evidence as part of the process of deciding

---

[17]*See*, Appellant Bushey's appellate brief to the Second Circuit, 2013 WL 2286627 at *1.

[18]See, 8:11-CV-0031-RFT, (NDNY), Docket No. [#20] at p. 9.

[19]*See*, Appellant Bushey's appellate brief to the Second Circuit, 2013 WL 2286627 at *20. ; see also, id. at *28 ("In denying Ms. Bushey's Request for Review, *the Appeals Council merely gave the boilerplate rationale: "In looking at your case, we considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council. We found that this information does not provide a basis for changing the Administrative Law Judge's decision"* (R: 1-2). The post-hearing MRI and EMG reports confirmed her continuing and deteriorating spinal disorder and supported her testimony regarding her pain and physical limitations.  They must be evaluated by an ALJ in determining whether or not she was disabled. This Court should remand this action for full consideration and analysis of this new and material evidence.") (emphasis added).

*whether to review* the ALJ's determination.  Clearly it does not, otherwise the Circuit

Panel would have ruled differently in *Bushey*.  Rather, it appears that *Snell* applies where

the Commissioner has decided to review the ALJ's determination based upon the newly-

submitted evidence, in which case the Commissioner must then weigh the new evidence

in the same manner that an ALJ is required to do so.  Significantly, in that regard, *Snell*

involved a situation where the Appeals Council not only reviewed the ALJ's decision, but

did so on its own motion. *See, Snell*, 177 F.3d at 129-130 ("The Social Security

Administration's Office of Hearings and Appeals (the "Appeals Council") reviewed the

case on its own motion, reversed the decision of the ALJ, and denied benefits to Snell.").

In the instant case the Appeals Council chose not to review the ALJ's decision

based on the additional evidence that Plaintiff submitted, and accordingly *Bushey*, and

not *Snell*, applies.  Furthermore, the Court finds, similar to the Circuit Panel in *Bushey*,

that here, "[t]he Appeals Council had substantial evidence supporting its decision to

decline review, as the new evidence that [Plaintiff] presented did not alter the weight of

the evidence so dramatically as to require the Appeals Council to take the case."  On this

point, the Court has already mentioned that Exhibits 18F-22F, which Plaintiff submitted to

the Appeals Council, were generally redundant, unhelpful to Plaintiff, or, in the case of

Jackson's statement (Exhibit 18F), unsupported and inconsistent with the rest of the

record.  Consequently, Plaintiff's arguments concerning the Appeals Council's

determination lack merit.

*The ALJ's RFC Determination*

Plaintiff next maintains that the ALJ's RFC determination was erroneous.  For example, Plaintiff contends that the ALJ "failed to specifically to [sic] determine the weight he assigned to  Dr. Toor's opinions," and that Toor's opinion was "not sufficiently specific to support the ALJ's limitations."[20]  Plaintiff further contends that the ALJ's RFC determination with regard to Plaintiff's ability to use his hands is inconsistent with Plaintiff's testimony that his fingers "freeze up" when it is cold outside.[21]  Plaintiff also contends that the ALJ's mental RFC finding was erroneous, since it was not adequately supported by the opinions of Hansen and Kamin.  For example, Plaintiff suggests that Hansen's opinion is inconsistent with the RFC determination, since she observed that Plaintiff "does not deal appropriately with stress," which, Plaintiff believes, "eliminat[es] the possibility for any work."[22]  However, the Court disagrees and finds that the ALJ's RFC determination, with regard to Plaintiff's physical and mental abilities, is supported by substantial evidence in the record.  Also, with regard to Toor's opinion, it is evident that the ALJ gave it controlling weight, since he essentially adopted Toor's statement after observing, *inter alia*, that it was "consistent with claimant's multiple surgeries and treatment history." (23).[23]

---

[20]Pl. Memo of Law at p. 25.

[21]Pl. Memo of Law at p. 25.  Plaintiff contends that such testimony establishes that he cannot use his hands "at all during periods of cold weather." *Id*.  The Court disagrees, and notes that, according to weather records,  when Toor examined Plaintiff on February 16, 2012, the outdoor temperature in Rochester ranged between 25 and 34 degrees Fahrenheit, and Plaintiff had full use of his left hand and only "mild to moderate difficulty" with his right hand. (368).

[22]Pl. Memo of Law at p. 26.

[23]In his memo of law, Plaintiff recognizes that "the ALJ appears to have given the opinion of Dr. Toor, the consultative examiner, the greatest weight." Pl. Memo fo Law at p. 19.

*The ALJ's Credibility Determination*

Plaintiff further maintains that the ALJ's  "rejection" of his credibility was erroneous, for several reasons.  First, Plaintiff argues that the ALJ's credibility determination was hampered by the ALJ's failure to develop the record, but the Court has already addressed Plaintiff's argument regarding development of the record.  Next, Plaintiff contends that the ALJ placed too much emphasis on his activities of daily living, since those activities may not accurately depict his "ability to perform a full day's work on a sustained basis."[24]  Further, Plaintiff suggests that the ALJ failed to take into consideration his "good work record" for the years 1992 through 2001 when assessing his credibility.  On this point, Plaintiff contends that he had "consistent earnings" during that period.[25]

At the outset, the Court does not believe that the ALJ was required to find Plaintiff credible merely because Plaintiff had a ten-year period in which his earnings were relatively consistent, particularly where such period ended nine years prior to the alleged onset date of disability. (146).  As to this issue, the Court observes that subsequently, between 2002 and 2009, when Plaintiff does not claim to have been disabled, his earnings fluctuated wildly, including two years (2002-2003) in which he earned only one thousand dollars or less and one year (207) in which he had no reported earnings. (146-147).  The Court therefore rejects Plaintiff's contention that the ALJ was required to factor in Plaintiff's "good work history" when evaluating Plaintiff's credibility.

---

[24]Pl. Memo of Law at p. 28.

[25]Pl. Memo of Law at p. 28.

More importantly, the suggestion that the ALJ generally "rejected" Plaintiff's credibility is incorrect.  For example, as Plaintiff admits elsewhere in his papers,[26] the ALJ gave him the "benefit of the doubt," and found his testimony regarding limitations in his upper extremities credible, even though Plaintiff had failed to mention any problems with his left elbow when Toor examined him. (23).

As for Plaintiff's activities of daily living, which were fairly extensive, the Court does not agree that the ALJ placed too much emphasis on them in assessing Plaintiff's credibility.  On this point, and as a general observation about this case after having studied the record, the Court notes that overall the evidence supporting a finding of disability, including much of the evidence that Plaintiff provided himself, *see, e.g.*, Exhibit 17F, was far from compelling, while the evidence that he is not disabled was more than substantial.  A consistent theme running throughout the record is that Plaintiff is capable of working when he takes his medications and refrains from using alcohol and illegal drugs.[27]  In any event, the Court has considered Plaintiff's arguments concerning the ALJ's credibility determination, and finds that they lack merit.

---

[26]Pl. Memo of  Law at p. 25.

[27]*See, e.g.*, treatment notes of David Strickland, M.D. ("I would say if he remains abstinent from alcohol, continues with therapy and responds well to the combined psychiatric medication [Lithium and Celexa] and psychotherapy approach, [which he admittedly did] he should do well.  However, certainly, if he goes back to drinking or abusing substances of any kind, his prognosis will be poor due to his history of impulsive behaviors.") (316); *see also*, Jackson's notion that Plaintiff's  "dysphoric mood" was "well controlled on current medications/followed by [therapy at Wayne Behavioral] twice a month.  Negative for suicidal ideas and self injury.  The patient is nervous/anxious (well controlled)." (481).

CONCLUSION

Defendant's motion for judgment on the pleadings [#11] is granted and Plaintiff's motion [#9] for judgment on the pleadings is denied.  The Clerk of the Court is directed to close this action.

So Ordered.

Dated: Rochester, New York
June 25, 2015

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge